IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

STEPHANIE STEPHENS,
*Plaintiff/Appellant,*

*v.*

STATE OF ARIZONA, ET AL.,
*Defendants/Appellees.*

No.  CV-25-0070-PR
**Filed May 22, 2026**

Appeal from the Superior Court in Maricopa County
The Honorable Rodrick J. Coffey, Judge
No.  CV2022-092486

**AFFIRMED**

Memorandum Decision of the Court of Appeals,
Division One
1 CA-CV 24-0309
Filed February 27, 2025

**VACATED**

COUNSEL:

Kristin K. Mayes, Arizona Attorney General, Rebecca A. Banes (argued),
Julie M. Rhodes, Deborah Garner, Assistant Attorneys General, Phoenix,
Attorneys for State of Arizona, et al.

Keith M. Knowlton (argued), Keith M. Knowlton, LLC, Chandler, Attorney for Stephanie Stephens

_____

CHIEF JUSTICE TIMMER authored the Opinion of the Court, in which VICE CHIEF JUSTICE LOPEZ, JUSTICES BEENE, KING, and CRUZ joined. JUSTICE MONTGOMERY concurred in part, dissented in part and dissented from the disposition. JUSTICE BOLICK dissented and joined JUSTICE MONTGOMERY in part.

_____

CHIEF JUSTICE TIMMER, Opinion of the Court:

¶1        This case arises from a series of family court and juvenile court proceedings involving Stephanie Stephens, Demetrius Kovacs, and their two minor children.   In the juvenile court proceedings, the Department of Child Safety ("DCS") successfully removed the children from both parents' care and initiated a dependency action that resulted in the children being found dependent as to both parents.   Although the dependency was ultimately dismissed after new information came to light, Stephens later filed a wrongful institution of civil proceedings ("WICP") claim against DCS employees, alleging that the application for removal and the dependency proceedings lacked probable cause.   Before us is whether Stephens sufficiently alleged the absence of probable cause needed to sustain that claim.   We conclude she did not, and the superior court, therefore, correctly dismissed the complaint.

**BACKGROUND**

¶2        Stephens appealed the superior court's dismissal of her first amended complaint ("complaint") pursuant to Arizona Rule of Civil Procedure 12(b)(6) for failing to allege a legally viable claim.   Therefore, the facts here are taken entirely from Stephens's complaint, redacted court records from the dependency proceedings that were presented to the superior court in this case, and the court of appeals' memorandum decision in the dependency case, *Stephanie S. v. Dep't of Child Safety*, No. 1 CA-JV 20-0227, 2021 WL 1578158 (Ariz. App. Apr. 22, 2021) (mem. decision).   *See Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 9 (2012) (stating that "public records regarding matters referenced in a complaint[] are not 'outside the

2

pleading,'" and courts can consider them as part of the Rule 12(b)(6) motion).

¶3        In July 2019, Stephens and Kovacs were engaged in a contentious marital dissolution proceeding, where they battled for custody of their two preteen children.   Kovacs alleged that the children feared Stephens's live-in boyfriend ("Boyfriend") and had been abused by him. After interviewing the children, the family court judge, Scott Blaney, found their statements not credible and maintained the existing parenting time arrangement.   Two months later, one child alleged that Boyfriend had touched her inappropriately, and Judge Blaney gave Kovacs temporary residential    custody.        According    to    DCS,    this    allegation    was unsubstantiated.

¶4        In February 2020, acting on his own motion, Judge Blaney entered temporary orders after expressing concern that Kovacs was manipulating the children to alienate them from Stephens.   He found that Kovacs had "worked to alienate the children away" from Stephens, that these actions risked the children's "mental and emotional wellbeing," and that they had caused the children to "not respect their mother and . . . refuse to participate in parenting time" with her.   The following month, after Kovacs lost his housing and on Stephens's motion, Judge Blaney awarded physical custody of the children to Stephens.   Kovacs avoided service of that order and absconded with the children.

¶5        The events giving rise to this lawsuit began on April 9, 2020, when DCS caseworker Conchetta Oglesby filed an application and declaration with the juvenile court to take temporary custody of the children pursuant to A.R.S. § 8-821(A).   Oglesby asserted that probable cause existed to believe temporary custody was clearly necessary to protect the children from abuse or neglect and that it was contrary to their welfare to remain in either parent's care.

¶6        In support of removal, Oglesby described DCS's frequent involvement with the family over the preceding year and the ongoing family court litigation.   She identified two conflicting court orders then in effect: a March 27 order of protection obtained by Kovacs that prohibited Stephens from contacting him or the children, and Judge Blaney's March 30 order awarding Stephens sole physical custody.   Oglesby also reported Kovacs's allegations in his application for the order of protection—that Stephens had stalked Kovacs and the children and that Boyfriend had

previously brandished a weapon—but told the court that the police found both allegations unfounded. Oglesby also noted that the abuse allegations against Boyfriend raised in September 2019 had been investigated and found unsubstantiated.

¶7            As to Kovacs, Oglesby alleged he was actively avoiding DCS, refusing to produce the children, and likely to flee with them. She stated that Kovacs had been evicted in March 2020, was homeless, and had been living with the children in a van. According to the declaration, Kovacs repeatedly provided false or unverifiable locations for the children, thwarting welfare checks and preventing DCS from assessing their safety. Oglesby further expressed concern that Kovacs's increasingly erratic and paranoid behavior, including a belief that DCS was conspiring with Stephens, posed a risk to the children.

¶8            As to Stephens, Oglesby asserted that the children feared Boyfriend, who exercised power and control over Stephens in a manner that impaired her ability to supervise and protect the children. The children had seen Boyfriend, who had "his own extensive DCS history," pull his own child by the arms from the back of a car. One child was so fearful of Boyfriend that she ran away twice from Stephens's home and said she would kill herself if made to stay there. Oglesby alleged that Stephens was unable or unwilling to take steps to understand her children's fears.

¶9            Oglesby further stated that Stephens had cognitive limitations that interfered with her ability to perform essential parental responsibilities and protect the children. According to the declaration, Stephens was unable to recognize Boyfriend's "emotional abuse and controlling behaviors," was easily manipulated by Boyfriend, and relied too heavily on Boyfriend to effectively parent the children.

¶10            Oglesby concluded that less intrusive alternatives to removal were not feasible because neither parent could safely parent the children. Kovacs was homeless and noncompliant with court orders, preventing the children from being located or assessed. Conflicting court orders complicated Stephens's ability to parent, and the children did not want to be with her due to her inability to protect them. Oglesby stated that "[n]either parent is capable of putting their children first and doing what is in their best interest."

¶11 Based on the application and declaration, Judge Rodney Mitchell found probable cause to believe that temporary custody was clearly necessary to protect the children from abuse or neglect and that remaining in the home was contrary to their welfare. Specifically, he found that the children faced threats from domestic violence or violent behavior, risk of abuse or neglect, and an unfit or unsafe home environment. Judge Mitchell authorized DCS to remove the children that same morning.

¶12 Later that day, in a separate proceeding, another superior court judge quashed Kovacs's order of protection against Stephens.

¶13 DCS filed a dependency petition with the juvenile court days later, on April 14, supported by Oglesby's verification and her prior declaration. DCS repeated many of the same concerns. It elaborated on the child's threat of suicide, stating that Stephens had taken the child to a hospital but did not allow her to remain for the recommended 24-hour hold. DCS further alleged that Stephens's intellectual disability and self-reported inability to remember basic necessities, like eating, prevented her from understanding her children's needs and making appropriate decisions for them. The petition also alleged that Stephens's reliance on Boyfriend, her inability to understand his power and control over her, and her lack of an independent support system negatively affected her ability to parent.

¶14 The removal and dependency petitions omitted certain facts. They did not reference Judge Blaney's finding that Kovacs had worked to alienate the children from Stephens. DCS informed the court in the dependency petition, however, that during virtual visits with the children in March and April, the children appeared coached to lie to DCS about their whereabouts. DCS further stated that Kovacs obtained the order of protection against Stephens the day after DCS asked him to allow her to keep the children temporarily while it considered how to proceed, but it did not inform the court that the order of protection had been quashed.

¶15 The juvenile court held a preliminary protective hearing and initial dependency hearing on April 20. *See* A.R.S. § 8-824. There, Stephens denied the petition allegations, refused services from DCS, and stated she intended to contest DCS taking temporary custody of the children once they were located. Judge David O. Cunanan approved a preliminary protective order regarding services, placement, and visitation and set a future hearing.

**¶16** On May 6, DCS located the children in Florida and took them into custody; Kovacs was arrested. After taking custody, DCS did not conduct forensic interviews of the children to determine the truth of the abuse allegations against Boyfriend. The children were placed in foster care.

**¶17** Judge Christopher Whitten held a contested dependency hearing on July 9. Stephens denied all allegations and accused Kovacs of coaching the children. Oglesby testified that it had crossed her mind that Kovacs might have been coaching the children to make allegations against Stephens. Nevertheless, Judge Whitten found the children dependent as to Stephens by a preponderance of the evidence.

**¶18** As relevant here, Judge Whitten found dependency warranted because (1) there was significant domestic violence involving Stephens and Kovacs, and Stephens and Boyfriend, that interfered with the parents' ability to care for the children; and (2) Stephens failed to investigate the children's allegations that Boyfriend had threatened them, despite evidence he had physically assaulted his own child in their presence. He further found out-of-home care was necessary to protect the children's welfare. The case plan was family reunification. Stephens appealed.

**¶19** On March 10, 2021, while the appeal was pending, DCS submitted a report to the juvenile court stating the children now admitted that Kovacs had coached them to lie about Stephens and Boyfriend. Two days later, the juvenile court suspended Kovacs's visitation, finding it harmful for him to have contact with the children after coaching them to make malicious allegations that could affect their mental health.

**¶20** The court of appeals affirmed the dependency on April 22. *See Stephanie S.*, 2021 WL 1578158, at *1 ¶ 1. Nevertheless, in light of the children's retraction, Judge Whitten terminated the dependency proceedings effective June 22, assumed temporary jurisdiction over the family court case, and placed the children with Stephens, finding it in the children's best interests because "[Stephens] ha[d] successfully participated in services to be reunified with the children." On July 15, at Stephens's request to "purge the record of the judicial finding that her children were dependent," Judge Whitten vacated his earlier order finding the children dependent as to Stephens. He stated he "certainly would not have" found the children dependent had he known that Kovacs had coached the

children to lie. He explained that "[w]hile life was not perfect in [Stephens's] home before the false allegations were made, it was not one lacking a parent who was capable of and willing to exercise proper care and control of the children."

¶21 Stephens filed this action asserting a WICP claim against the State, Oglesby, and other DCS employees (collectively, "DCS") seeking compensatory and punitive damages.[1] The superior court granted DCS's motion to dismiss the complaint pursuant to Rule 12(b)(6), reasoning that Stephens cannot prevail on her claim as a matter of law because she cannot prove that DCS initiated or maintained the dependency action without probable cause, an element of a WICP claim. The court reasoned that although Judge Whitten had vacated his dependency finding, he never vacated Judge Mitchell's determination at the case's inception that probable cause existed to remove the children from Stephens's care. The court explained that "[v]acating the dependency finding is not the same thing as vacating the initial finding that there was probable cause to remove the children from [Stephens's] care." The court later denied Stephens's motion for new trial without comment.

¶22 The court of appeals reversed, concluding that Stephens adequately alleged the absence of probable cause and malice, which was another element of her claim. *See Stephens v. State*, No. 1 CA-CV 24-0309, 2025 WL 657568, at *1 ¶ 1 (Ariz. App. Feb. 27, 2025) (mem. decision). The court disagreed with the superior court that Stephens's claims were precluded by Judge Whitten's failure to vacate Judge Mitchell's initial finding of probable cause because that finding was not at issue when the dependency was vacated. *See id.* at *2 ¶ 7. It then found that Stephens sufficiently alleged lack of probable cause and malice for initiating or maintaining the dependency proceedings by asserting that DCS consciously disregarded or intentionally concealed Judge Blaney's order finding that Kovacs had worked to alienate the children from Stephens. *See id.* at *3 ¶ 9.

---

[1] Stephens also alleged claims for negligent hiring, retention or supervision; intentional interference with parental custody of a child; negligence; and a violation of 42 U.S.C. § 1983. The parties treat the first three claims as depending on the viability of the WICP claim. The federal district court dismissed the § 1983 claim after the case was temporarily removed from the state courts.

**¶23** We granted review of DCS's subsequently filed petition for review because whether a viable WICP claim exists in these circumstances is an important issue of statewide interest. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

**¶24** We review the superior court's dismissal of Stephens's complaint de novo because it presents issues of law. *See City of Mesa v. Ryan*, 258 Ariz. 297, 318 ¶ 8 (2024). Dismissal under Rule 12(b)(6) is proper only if, as a matter of law, Stephens would not be entitled to relief even if the alleged facts are proven true. *See Coleman*, 230 Ariz. at 356 ¶ 8. In making this determination, we assume the truth of the complaint's factual allegations and indulge all reasonable inferences from those facts. *Id.* ¶ 9. We give no weight to conclusory statements. *See id.*

**¶25** To state a WICP claim, Stephens was required to allege that DCS (1) instituted a civil action that was (2) motivated by malice, (3) begun or maintained without probable cause, (4) terminated in Stephens's favor, and (5) damaged her. *See Bradshaw v. State Farm Mut. Auto Ins. Co.*, 157 Ariz. 411, 416–17 (1988); *Chalpin v. Snyder*, 220 Ariz. 413, 418–19 ¶ 20 (App. 2008) (quotation omitted). We carefully circumscribe these elements so that litigants with potentially valid claims are not deterred from filing suit by the prospect of a WICP claim should they not prevail. *See Griswold v. Horne*, 19 Ariz. 56, 59–60 (1917) (stating that the claim's elements should be "properly guarded and their true principles strictly adhered to" because adopting a policy which "would make every unsuccessful plaintiff in a civil case, or every witness for the state in a criminal case, liable in damages to the defendant therein, whenever the plaintiff in the case failed to obtain judgment, would make litigation, so hazardous that men would fear to resort to it." (quoting Modern American Law, vol. 2, p. 287)); *see also Anderson Development Co. v. Tobias*, 116 P.3d 323, 339 ¶ 59 (Utah 2005) (acknowledging that courts traditionally disfavor WICP claims because of their potential chilling effect on accessing courts); *Butera v. Boucher*, 798 A.2d 340, 354 (R.I. 2002) (to same effect). At the same time, nothing in this framework shields knowing or reckless deception in proceedings that implicate fundamental parental interests. The only questions before us are whether Stephens sufficiently alleged a lack of probable cause.

## A.   DCS Waived Its Issue Preclusion Argument.

¶26        DCS argues that issue preclusion bars Stephens from relitigating whether probable cause existed to initiate or maintain the dependency proceedings.   *See Crosby-Garbotz v. Fell*, 246 Ariz. 54, 57 ¶ 10 (2019) ("Issue preclusion serves to protect litigants from the burden of relitigating an identical issue and to promote judicial economy by preventing needless litigation." (citation modified)).   DCS raised this argument for the first time in its supplemental brief, and Stephens did not have an opportunity to respond.   We, therefore, conclude the argument is waived and do not address it.   *See Estate of DeSela v. Prescott Unified Sch. Dist. No. 1*, 226 Ariz. 387, 389 ¶ 8 (2011).

## B.   The Adjudications In The Removal And Dependency Proceedings Establish Probable Cause Because They Were Not Procured by Fraud, Perjury, Or Other Corrupt Means.

¶27        Prior adjudications in favor of the initiator generally establish probable cause in malicious prosecution cases, and the same rule applies here.   *See Wisniski v. Ong*, 94 Ariz. 123, 125 (1963).   In *Wisniski*, this Court addressed this issue in the context of a malicious prosecution claim.   *Id.* There, a municipal court convicted Ann Ruth Wisniski of petty theft upon store clerk Luis Meza's report that she had stolen pills from the store.   *Id.* at 124.   After her conviction was reversed, Wisniski sued Meza, the store, and others for malicious prosecution and prevailed at trial.   *Id.*   The superior court entered judgment for Meza and the store notwithstanding the verdict, and this Court affirmed.   *Id.*

¶28        Relying on the Restatement (First) of Torts § 667 (Am. L. Inst. 1938), which was "supported by the great weight of authority," we concluded that a conviction, even if later reversed, "conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means."   *See Wisniski*, 94 Ariz. at 125 (quoting Restatement (First) § 667).   Because Wisniski's conviction did not fall within this exception, it established probable cause as a matter of law. *See id.* at 124.   In reaching that conclusion, the Court rejected Wisniski's argument that the prosecuting attorney's untrue statements at trial that she was a "gang moll" and had an F.B.I. record triggered the exception.   *Id.* at 125.   We explained that trial errors are generally only subject to appellate review, and, even if "classified as unfair," are not the sort of

"corrupt means as [to] permit an attack on the conclusive effect of the judgment of conviction." *Id.* Instead, "'other corrupt means' are acts of similar nature to extrinsic fraud and perjury, acts which would tend to vitiate a judgment on collateral attack" and that were "induced by some [act] or acts of the defendant in the malicious prosecution action." *Id.*; *see also Creamer v. Raffety*, 145 Ariz. 34, 40 (App. 1984) (concluding that summary judgment for the defendant on a malicious prosecution claim was appropriate where the plaintiff was convicted by a court, although the conviction was later reversed, because a conviction "conclusively establishes the existence of probable cause" unless it was "obtained by fraud, perjury or other corrupt means" (quoting Restatement (Second) of Torts § 667(1) (Am. L. Inst. 1977))).

¶29 In supplemental briefing submitted after oral argument here, both parties assert that the analysis for the malicious prosecution claims in *Wisniski* and *Creamer* applies to WICP claims. We agree. Claims for malicious prosecution and WICP share essentially the same elements, with the former applying to criminal proceedings and the latter to civil proceedings.[2] *See Bradshaw*, 157 Ariz. at 417. No reason exists to carve out a different principle in WICP claims for assessing the effect of prior adjudications on probable cause. And in applying *Wisniski* and *Creamer* here, we do not—as Justice Bolick suggests—decide this case as one for malicious prosecution. *See infra* ¶ 83. Rather, this case presents our first occasion to apply, in the WICP context, the same adjudication-based principle that those decisions announce and that the Restatement likewise recognizes. *See* Restatement § 675 cmt. b (citing Restatement § 667(1) and explaining that "[a]s in the case of the initiation of criminal proceedings, a decision by a competent tribunal in favor of the person initiating civil

---

[2] The probable cause elements for the claims differ slightly in a way immaterial to the applicability of *Wisniski* and *Creamer*. In a malicious prosecution claim, "probable cause exists *only* if the prosecutor actually believes that the accused was guilty of the crime." *See Bradshaw*, 157 Ariz. at 417. A mere suspicion is insufficient. *See* Restatement § 675 cmt. d. In a WICP claim, however, probable cause exists if "the initiator reasonably believes that he has a good chance of establishing his case to the satisfaction of the court or the jury." *See Bradshaw*, 157 Ariz. at 417 (citation modified); Restatement § 675 cmt. d ("In a word, the initiator of private civil proceedings need not have the same degree of certainty as to the relevant facts that is required of a private prosecutor of criminal proceedings.").

proceedings is conclusive evidence of probable cause," even if the decision is later reversed).

¶30　　Thus, we treat the juvenile court rulings and the court of appeals decision as establishing probable cause, absent well-pleaded facts showing they were procured by fraud, perjury, or other corrupt means. *See Wisniski*, 94 Ariz. at 124–25; *Creamer*, 145 Ariz. at 40; Restatement § 675 cmt. b.　　Notably, it is the dependency adjudication, affirmed on appeal—not the ex parte removal order standing alone—that establishes probable cause for the dependency action.　Judge Whitten's later vacatur of the dependency order, based on newly discovered evidence (the children's recantation), does not alter the inquiry, which focuses solely on whether DCS procured the original adjudication by fraud, perjury, or other corrupt means.　*See Wisniski*, 94 Ariz. at 124–25; *Creamer*, 145 Ariz. at 40; Restatement § 675 cmt. b.　Contrary to Justice Bolick's characterization, *see infra* ¶ 93, Judge Whitten did not vacate the dependency order based on any finding that DCS presented "misleading and incomplete testimony," nor did he cast aspersions on DCS's conduct or presentation during the removal and dependency proceedings.　He vacated the order because his ruling had relied largely on the children's abuse allegations, which they later recanted.

¶31　　Justice Montgomery would assess probable cause by asking whether DCS conducted an adequate investigation before maintaining the dependency.　*See infra* ¶¶ 61–64, 69–76.　But that approach overlooks *Wisniski*, *Creamer*, and Restatement § 675 comment b's pronouncement that once a competent tribunal has adjudicated in the initiator's favor, the adjudication is ordinarily conclusive evidence of probable cause, even if it is later reversed and the proceedings ultimately terminate in favor of the person proceeded against.　To the extent Restatement § 675 comment c references § 662's discussion of investigation, that guidance informs the probable-cause inquiry where no competent tribunal has adjudicated in the initiator's favor; it does not displace § 675 comment b's rule regarding the effect of a favorable adjudication.　Nor do we see a material distinction here between a reversal and a vacatur.　In either event, the proceedings ultimately terminate in favor of the person bringing the WICP claim, and the rule yields only if the favorable adjudication was procured by fraud, perjury, or other corrupt means.

¶32　　Relevant here, Stephens does not allege that DCS committed fraud or perjury in the dependency proceedings.　Rather, she alleges

"other corrupt means" by asserting that DCS omitted or misrepresented material facts that, if provided to the juvenile court and the court of appeals, would have caused those courts to reach a different result. For our purposes, "other corrupt means" includes situations where the initiator knowingly presents materially false evidence or suppresses material facts, that is akin to extrinsic fraud or perjury and would tend to vitiate the adjudication on collateral attack. *See Wisniski*, 94 Ariz. at 125. We, therefore, consider whether these allegations, if proven, sufficiently demonstrate that the removal and dependency decisions were procured by "corrupt means" such that they do not evidence probable cause. *See Wisniski*, 94 Ariz. at 124–25; *Creamer*, 145 Ariz. at 40.

¶33 The evidence before the juvenile court included Oglesby's statements in her declaration that: (1) one child's September 2019 allegation—that Boyfriend had touched her inappropriately—was unsubstantiated; (2) "the children appear[ed] coached to lie to [DCS] in regards to their whereabouts" after Kovacs lost his housing; (3) the police found Kovacs's allegations against Stephens and Boyfriend underlying the order of protection "unfounded;" and (4) the family court had recently awarded Stephens sole temporary custody of the children on her motion. In addition, as alleged in the complaint, Stephens "vehemently denied" DCS's allegations to the juvenile court and asserted that "all allegations against [Boyfriend] were false, and that the children were being coached and manipulated by [Kovacs] as found by the [family] court." The evidence also included Oglesby's testimony at the dependency hearing that "it had crossed her mind that [Kovacs] was coaching the girls to make the allegations against [Stephens]." The juvenile court had all this information when it authorized removal and later adjudicated the children dependent.

¶34 Nevertheless, Stephens faults DCS for failing to inform the juvenile court that: (1) Kovacs was alienating the children from her and may have been coaching them to make false allegations; (2) Judge Blaney had recently awarded her sole physical custody after finding that Kovacs was attempting to alienate the children from Stephens; and (3) Judge Blaney had previously determined the children's July 2019 allegations, that Boyfriend abused them and they feared him, were not credible. Stephens also claims that DCS misstated the facts by resubmitting Oglesby's declaration with the dependency petition but not informing the court that the protective order had been quashed the same day Judge Mitchell issued the temporary removal order.

¶**35**        Even assuming the truth of these allegations, they do not constitute "corrupt means" that would have vitiated the removal and dependency decisions on collateral attack.   *See Wisniski*, 94 Ariz. at 125. True, Judge Whitten later said he "certainly would not have" adjudicated the children dependent as to Stephens had he known that Kovacs had coached the children to lie about Stephens and Boyfriend.   That statement goes to the materiality of the children's accusations at the dependency ruling.   But Stephens's complaint does not plausibly allege that DCS procured that false evidence or knew they were presenting false evidence. To the contrary, Stephens alleges that the coaching was discovered several months later, in March 2021, well after Judge Whitten had adjudicated the children dependent by a preponderance of the evidence.   She further alleges that once DCS learned of the coaching, it immediately disclosed that information to the juvenile court, which then suspended Kovacs's visitation and ultimately terminated the dependency.   These allegations do not plausibly support an inference that DCS knowingly procured or presented materially false evidence, or suppressed material facts, in a manner akin to fraud or perjury and amounting to "corrupt means."   *See Wisniski*, 94 Ariz. at 124–25; *Creamer*, 145 Ariz. at 40; Restatement § 675 cmt. b.   On the pleaded facts, Kovacs, not DCS, coached the children to lie.   Nothing alleged plausibly suggests that DCS induced, orchestrated, or exploited Kovacs's misdeed to obtain the adjudication.

¶**36**        Nor do Stephens's allegations that DCS failed to inform the juvenile court of Judge Blaney's findings concerning parental alienation and the July 2019 abuse allegation, his order awarding Stephens sole physical custody, or the quashing of the order of protection demonstrate corrupt means.   As an initial matter, the application and declaration for removal and the dependency petition do not support Stephens's latter two allegations.   Oglesby's declaration expressly states that "on 03/30/2020 [Stephens] filed for sole temporary custody of the children and was awarded custody through family courts."   There was, therefore, no omission regarding the custody order.   As for the order of protection, it was quashed only after DCS sought removal, and Stephens does not allege that DCS knew of that development before initiating or while maintaining the dependency proceedings.   Even so, DCS did not allege in the dependency petition that the conflict between the order of protection and the custody order served as a basis for dependency.   Under these circumstances, DCS's failure to inform the court that the order had been quashed had no bearing on the dependency proceedings.

¶37        Turning to DCS's failure to inform the juvenile court of Judge Blaney's findings concerning parental alienation and the children's July 2019 allegations, those omissions likewise do not reflect "corrupt means" that would have vitiated the removal or dependency rulings. *See Wisniski*, 94 Ariz. at 124–25. DCS had informed the juvenile court that Kovacs had potentially coached the children to make the allegations of fear and abuse that formed the foundation for those proceedings. As described above, Oglesby informed the court that she believed Kovacs had coached the children to lie about their whereabouts and that the September 2019 abuse allegation was unsubstantiated, and she testified that it had crossed her mind that Kovacs was coaching the children to make the current allegations. Stephens herself asserted that Kovacs had coached the children to lie, and she informed the court that the family court had found he coached and manipulated them. Thus, although DCS did not convey Judge Blaney's rulings, the juvenile court was apprised of the core alienation and coaching concerns. In these circumstances, the omissions do not amount to knowing, fraud-or-perjury-like deception that would vitiate the rulings on collateral attack. *See Wisniski*, 94 Ariz. at 125. For these reasons, the prior adjudications by the juvenile court and the court of appeals establish, as a matter of law, that DCS had probable cause to initiate and maintain the actions for removal and dependency.

### C.   Alternatively, Even Discounting The Prior Adjudications, Stephens's Allegations, If True, Do Not Demonstrate A Lack Of Probable Cause.

¶38        Whether DCS acted without probable cause is a question of law involving objective and subjective inquiries. *See Bradshaw*, 157 Ariz. at 417; *Carroll v. Kalar*, 112 Ariz. 595, 598 (1976). Probable cause exists if, when DCS initiated or maintained the dependency action, it honestly believed in the action's possible merits and this belief was objectively reasonable. *See Bradshaw*, 157 Ariz. at 417; *see also Carroll*, 112 Ariz. at 596 ("Upon the appearances presented to the defendant, would a reasonably prudent man have instituted or continued the proceeding?" (citation modified) (quoting *McClinton v. Rice*, 76 Ariz. 358, 367 (1953))). Although DCS could not base its belief on facts it knew were untrue, it was not required to be absolutely certain of the factual basis for the dependency, only that it reasonably believed it had a good chance of establishing the dependency to the court's satisfaction. *See Bradshaw*, 157 Ariz. at 417. Because dependency must be proven by a preponderance of the evidence, DCS was required to believe it could meet that standard. *See* A.R.S.

§ 8-844(C).  Whether the facts alleged demonstrate a lack of probable cause "is always a question of law to be determined by the court."  *See Carroll*, 112 Ariz. at 598.

**¶39**        Stephens argues that she sufficiently alleged that DCS lacked probable cause by stating that DCS knowingly or recklessly made false statements to the juvenile court or omitted material facts that undermined the need for removal and a dependency.  As relevant to the probable cause element needed to assert a WICP claim, we understand Stephens to argue that these allegations show that DCS did not honestly believe in the dependency action's possible merits and/or that any such belief was objectively unreasonable.  *See Bradshaw*, 157 Ariz. at 417; *Carroll*, 112 Ariz. at 596.

**¶40**        Even putting aside the effect of the juvenile court rulings and the court of appeals' decision on probable cause, Stephens's allegations, if true, do not demonstrate a lack of probable cause.  DCS's omission of potentially favorable or competing evidence, including Judge Blaney's alienation finding, does not negate probable cause.  Probable cause does not require DCS to disclose every fact that might undermine its position or to present a perfectly balanced narrative; it requires only an honest and objectively reasonable belief that removal and dependency can be established.  *See Bradshaw*, 157 Ariz. at 417.  The relevant inquiry, therefore, is whether omitting reference to Judge Blaney's two orders supports an inference that DCS lacked such a belief.

**¶41**        Even crediting the omissions, DCS could honestly and reasonably believe it could show the need for removal and prove dependency as to Stephens.  The children repeatedly reported that they were afraid of Boyfriend, they did not feel safe in Stephens's home, and that Stephens would not protect or believe them, instead calling them "liars." They described Boyfriend's heavy drinking, screaming, violence, and physical abuse and revealed that one child had twice run away and stated she would commit suicide if forced to live in the same house as Boyfriend. The children also recounted that Boyfriend had once chased one child out of the home, pushed her down, and pinned her with his foot.  Another time, he locked the other child in her room and, although she yelled for Stephens to help, Stephens did not intervene.  Both children had reported witnessing Boyfriend pulling his child forcibly from a car by the arms.

15

¶42     Although we assume DCS knew of Judge Blaney's findings regarding the July 2019 abuse allegations and Kovacs's efforts to alienate the children from Stephens, that knowledge does not mean DCS knew that the children were lying about their experiences or fears.   Judge Blaney did not find that Kovacs coached the children to fabricate allegations, and Stephens does not allege that DCS had independent information establishing that the children's disclosures were false.

¶43     Justice Montgomery finds that DCS's belief in the dependency action's merits may be unreasonable because it purportedly failed to forensically interview the children during the two-month period between their return from Florida and the dependency hearing.   *See infra* ¶ 73.   Even if true, this lapse did not make DCS's belief unreasonable. The children had previously and repeatedly reported to DCS their allegations concerning Boyfriend.   *See Stephanie S.*, 2021 WL 1578158, at *1 ¶¶ 2–4.   The complaint does not plausibly allege facts showing that additional interviews, if conducted, would have undermined DCS's reasonable basis to believe it could establish dependency on the children's repeated prior reports.   *See Bradshaw*, 157 Ariz. at 417.   Although the complaint alleges that if DCS had interviewed the children it would have learned that the children's prior reports were false, this allegation is speculative and conclusory, at best, and cannot support a viable claim.   *See Coleman*, 230 Ariz. at 356 ¶ 9.

¶44     DCS also had a reasonable basis to believe Stephens's relationship with Boyfriend impaired her ability to parent and protect the children.   DCS workers observed Boyfriend exerting "power and control" over Stephens, and the children reported that Boyfriend controlled her. The case manager explained that Stephens could be contacted only through Boyfriend and that she deferred to him before answering questions, making it difficult to determine whether she could make decisions independently for herself and the children.   Because Stephens has an intellectual disability, DCS was particularly concerned that Boyfriend could easily manipulate her, impairing her ability to effectively parent her children.

¶45     The circumstances leading to removal reinforced an objectively reasonable concern that Stephens would not exercise protective care when needed.   By March 2020, Kovacs was homeless and living with the children in a van.   Although Stephens knew the children's location, she waited a month to seek sole custody, leaving the children to a transient and unstable lifestyle.

**¶46** Even accepting as true the complaint's allegations and the public court records properly considered, Stephens has not sufficiently pleaded facts showing that DCS lacked probable cause to initiate or maintain the removal and dependency proceedings. *See Bradshaw*, 157 Ariz. at 417; *see also Carroll*, 112 Ariz. at 596. In so holding, we do not minimize the profound hardship family separation can impose. Nor do we suggest that state actors are insulated when they knowingly, or with reckless disregard for the truth, make false statements or withhold material facts in proceedings that implicate fundamental parental interests. Rather, we simply apply Rule 12(b)(6) and our WICP precedents at the pleading stage. For this independent reason, the trial court properly dismissed the complaint under Rule 12(b)(6).

## CONCLUSION

**¶47** For the foregoing reasons, we vacate the court of appeals' decision and affirm the trial court's grant of DCS's Rule 12(b)(6) motion to dismiss for failure to state a claim.

17

STEPHENS v. STATE
Justice Montgomery, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which Justice Bolick joins in Part

MONTGOMERY, J., concurring in part, dissenting in part, dissenting from the disposition, with which BOLICK, J., joins except as to paragraphs 48, 68, and 78.

¶48         I concur with the Majority's disposition of DCS's issue preclusion argument. *Supra* ¶ 26.   I also concur with the Majority's conclusion that DCS had probable cause to seek the ex parte temporary order for removal and that DCS had an honest, subjective belief that it could establish the dependency. *Supra* ¶ 41.   However, for the reasons that follow, I conclude that Stephens sufficiently alleged in her complaint that DCS lacked an objectively reasonable belief that it could establish Stephens's children were dependent.   Therefore, I respectfully dissent and would affirm the trial court's dismissal of the WICP claim as to the ex parte removal but reverse as to the dependency action and remand for further proceedings.   Whether her claim can withstand a motion for summary judgment is another matter.

## DISCUSSION

¶49         To prevail on her WICP claim, Stephens must establish that DCS: "(1) instituted a civil action which was (2) motivated by malice, (3) begun [or maintained] without probable cause, (4) terminated in plaintiff's favor and (5) damaged plaintiff." *Wolfinger v. Cheche*, 206 Ariz. 504, 508–09 ¶ 23 (App. 2003) (quoting *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 416–17 (1988)).   In reviewing her claim, we "must *assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts*, but mere conclusory statements are insufficient." *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶ 9 (2012) (emphasis added).[3]

¶50         DCS's motion to dismiss argued that Stephens's complaint failed to establish that DCS acted without probable cause in initiating or maintaining the dependency action.   What constitutes probable cause to maintain the dependency action, therefore, warrants careful examination of the record.   But before assessing probable cause, the Majority's reliance on "prior adjudications" requires scrutiny.

---

[3]   And in making our determination, we may consider "public records regarding matters referenced in a complaint." *Coleman*, 230 Ariz. at 356 ¶ 9.

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

## A. Prior Adjudications

**¶51**        The Majority cites *Wisniski v. Ong*, 94 Ariz. 123 (1963), and *Creamer v. Raffety*, 145 Ariz. 34 (App. 1984), to invoke Restatement (First) of Torts § 667, as well as Restatement (Second) of Torts § 675, respectively. *Supra* ¶¶ 28–29.   Taken together, the Majority concludes that the ex parte temporary removal order, dependency order, and the court of appeals' decision are "prior adjudications" that conclusively establish probable cause.   *Supra* ¶ 30.   There are significant problems given the context of this case, though, with the Majority's conclusion and use of these authorities.[4]

**¶52**        As set out by the Majority, *Wisniski* involved the same general scenario addressed by the Restatement sections, as does *Creamer*.   The defendant was convicted of a crime—petty theft—the conviction was later reversed, and she brought a civil suit for malicious prosecution.   *Supra* ¶ 27.   Without justification—beyond noting the shared elements of a malicious prosecution claim and WICP claims—the Majority then applies criminal, case-based principles to a WICP claim.   *Supra* ¶ 29.   But a careful reading of the Restatement sections and related Comments calls into question whether they should apply to this case and, if so, whether they should apply as the Majority has used them.

1.   <u>Restatement sections</u>

**¶53**        Restatement § 667 does indeed provide that "[t]he conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means."   But we do well to consider the rationale underlying the conclusive effect given to a prior conviction, which is stated in Comment b to Restatement § 667(1).

---

[4]   The Court ordered the parties to provide supplemental briefing as to whether *Wisniski* and *Creamer* applied to this case.   Although they agreed that the cases and the respective Restatement sections apply, the parties' briefing did not address the differences in the nature of the proceedings between the cases and the matter before us.   Consequently, they also did not address the underlying rationale of the Restatement provisions.

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

¶54　　　　Comment b states that, absent fraud, perjury, or other corrupt means, "the opinion of the trier of fact expressed by its verdict under the rule that the guilt of the accused must be established beyond a reasonable doubt, is regarded as conclusive evidence that the person who initiated the proceedings had reasonable grounds for so doing."　In other words, meeting the greater standard of proof required for a conviction necessarily establishes that the lesser standard of proof was met to begin the prosecution.　*Cf. State v. Snelling,* 225 Ariz. 182, 186 ¶ 12 (2010) (stating that "a conviction precludes review of the finding of probable cause made by a grand jury" (quoting *State v. Moody,* 208 Ariz. 424, 440 n.3 ¶ 31 (2004))); A.R.S. § 13-202(C) (providing that proof of a greater culpable mental state establishes proof of a lesser culpable mental state).　A conviction later reversed on appeal, thus, does not establish that probable cause for initiating the prosecution was lacking.

¶55　　　　No analogous relationship exists, though, between an ex parte order and a subsequent dependency finding.　DCS can petition for dependency without having first secured an ex parte temporary removal of children.　Therefore, the logic underlying Restatement § 667 does not apply to the facts of this case.　The ex parte removal order has no conclusive effect regarding probable cause for the dependency finding; DCS must have a separate, objectively reasonable belief to initiate and maintain the actions it pursued in this case.

¶56　　　　Next, Restatement § 675 Comment b states that "[a]s in the case of the initiation of criminal proceedings, a decision by a competent tribunal in favor of the person initiating civil proceedings is conclusive evidence of probable cause."　Significant to the application of Restatement § 675 here is the fact that the "competent tribunal" that made the dependency finding later vacated the order.

¶57　　　　On October 29, 2020, the juvenile court issued an order making specific findings regarding the dependency determination, stating that it was based on testimony and exhibits that included "[Stephens] neglected the children by failing to protect them.　They reported watching [Stephens's] boyfriend . . . physically assault his biological child in their presence and, separately, being threatened by [him].　In response, [Stephens] did not investigate the threats, instead calling the children liars."

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

¶**58**        On July 15, 2021, the juvenile court vacated the reasons for its finding of dependency regarding the children.   The order reads in relevant part:

> On July 9, 2020 the Juvenile Court found Mother's two children to be dependent children, *based almost exclusively on their complaints of abuse by Mother's boyfriend and Mother's failure [to] respond appropriately to protect the girls from that abuse*. After more than nine months, just before the Report and Review Hearing on March 12, 2021, both girls revealed that Father had coached them to make up false allegations against Mother's boyfriend. They told the case manager that *none of the abuse allegations which formed the basis of the July 9, 2020 dependency were true.*
>
> ****
>
> Mother now seeks to purge the record of the judicial finding that her children were dependent – that she was not able and willing to exercise proper care and control of them. The Court has review[ed] the evidence which lead to its July 9, 2020 dependency finding. The Department correctly points out that there were other, much less serious, allegations raised in the initial reports. *The question, then, is whether the Court would have ever found a dependency on the record that existed on July 9, 2020 without the problems created by Father encouraging the children to falsely accuse Mother's boyfriend of abuse.*
>
> *It certainly would not have.*
>
> While life was not perfect in Mother's home before the false allegations were made, it was not one lacking a parent *who was capable of and willing to exercise proper care and control of the children*.
>
> ACCORDINGLY,     Mother's     Motion     for Reconsideration/Motion to Set Aside Dependency Finding is granted and the Court's order that the children were ever dependent as to Mother is vacated.

(Emphasis added.)   The court's reasons underscore the impact of the false allegations made by the children and undermine any reliance by the Majority on the prior dependency finding as conclusive evidence of

21

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

probable cause. Additionally, the juvenile court's concerns about the false allegations go beyond whether they are "material[] . . . to the dependency ruling." *Supra* ¶ 35. The nature of the allegations also informs the determination of whether DCS had an objectively reasonable belief in maintaining the dependency action as discussed more fully below. If we are going to invoke § 675, we should not do so selectively to deny Stephens her day in court.

¶59 The court of appeals later affirmed the juvenile court's dependency finding, which Stephens argued had no reasonable evidence to support it. *Stephanie S. v. Dep't of Child Safety*, No. 1 CA-JV 20-0227, 2021 WL 1578158, at *1–2 ¶¶ 1, 11 (Ariz. App. Apr. 22, 2021) (mem. decision). In finding that there was reasonable evidence, the court relied on the same record that the juvenile court considered and noted that "[t]he evidence supports the juvenile court's finding that Mother neglected the children and was unable or unwilling to provide them proper and effective parental care and control." *Id.* at *2 ¶ 12. Yet, as noted, the juvenile court vacated its order, stating that, "[w]hile life was not perfect in Mother's home before the false allegations were made, it was not one lacking a parent *who was capable of and willing to exercise proper care and control of the children*." (Emphasis added.) Thus, given the court of appeals' errant reliance on evidence the juvenile court focused on in vacating its order, the decision cannot be fairly relied on as conclusive evidence of probable cause.

¶60 Ultimately, the Majority asserts that "[n]o reason exists to carve out a different principle in WICP claims for assessing the effect of prior adjudications on probable cause." *Supra* ¶ 29. That may be true, but equally, no reason exists to treat vacated court decisions based on demonstrably false allegations as conclusive evidence of probable cause under § 675. A vacated order is not a "decision in favor of the initiating party" under any reading of § 675. And the Restatement does not address vacated orders at all. The Comments remain applicable regardless of the adjudication. *Cf. supra* ¶ 31.

¶61 There is more to consider here, as well. Comment c to § 675 provides that:

> The considerations that determine the reasonable character of
> the original plaintiff's belief in the existence of facts upon
> which his claim is based are, except as stated in Comment *d*,

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

in substance similar to those that determine whether the belief of a private prosecutor as to the conduct of the accused is reasonable, and to this extent Comments *e*, *f*, and *g* on § 662 are applicable.

## 2.   Comments

**¶62**          Comment e to § 662 provides that:

It is the facts known or reasonably believed by the private prosecutor that determine the existence or non-existence of probable cause . . . . If, in the light of the facts as he knows or reasonably believes them to be, a reasonable man would believe that the conduct of the accused was such as to make him guilty of the offense charged against him, *the existence of exonerating facts is immaterial unless those facts would have been disclosed by such an investigation as the prosecutor should have made before initiating the proceedings.*

(Emphasis added.)    Comment e further references Comment j, addressing "Mistake of fact—Necessity for investigation", which concludes stating:

[I]t may be said that the defendant has probable cause only when a reasonable man in his position would believe, and the defendant does in fact believe, that he has sufficient information as to both the facts and the applicable law to justify him in initiating the criminal proceeding *without further investigation or verification.*

(Emphasis added.)

**¶63**          Lastly, Comment g to § 662 addresses the types of mistakes that might be made in initiating criminal proceedings.   Relevant for our purposes is the observation:

A second type of mistake as to the conduct of the accused may be due to the accuser's reliance upon information given him by a third person. Whether the accuser acts reasonably in relying upon the accuracy of the information depends not only upon the informant's veracity as known to the accuser by experience or reputation, but also upon his opportunity for

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

accurate observation and his equipment for making it . . . . If
the accusation is based upon information given by a third
person, *the only important matter is the reliability of the informant*.

(Emphasis added.)

**¶64**        Thus, a determination of probable cause based upon
information from a third party calls for consideration of the third party's
reliability and whether further investigation would have disclosed
"exonerating facts" before initiating or maintaining the proceedings.   And
in this case, it is unwise to apply the rationale of §§ 667 and 675 without
considering the importance of forensically interviewing the children, which
informs the probable cause determination.

### B. Probable Cause

**¶65**        "Whether the facts in a particular case are sufficient to
constitute probable cause is a question of law to be determined by a
reasonable man test. '(U)pon the appearances presented to the defendant,
would a reasonably prudent man have instituted or continued the
proceeding?'"   *Carroll v. Kalar*, 112 Ariz. 595, 596 (1976) (quoting *McClinton
v. Rice*, 76 Ariz. 358, 367 (1953)).   In particular, the "test is subjective *and*
objective."   *Bradshaw*, 157 Ariz. at 417.   "The initiator of the action must
honestly *believe* in its possible merits; and, in light of the facts, that *belief
must be objectively reasonable*.""   *Id.*   And "[t]he failure to establish a lack
of probable cause is a complete defense to an action for malicious
prosecution."   *Carroll*, 112 Ariz. at 596.

**¶66**        The question to resolve with respect to probable cause to
maintain the dependency following the ex parte removal is whether DCS
had an honest belief that it could establish that the children were dependent
as required by A.R.S. § 8-844 and that such a belief was objectively
reasonable in light of the facts.

**¶67**        Stephens alleges that DCS failed to take any action to
determine the truthfulness of the children's allegations before or after
taking the children into custody.   In particular, she asserts that DCS
should have forensically interviewed the children "to determine if the
stories were made up or true, especially since the Family Court Judge had
interviewed the children and found those allegations were not true."
Stephens further alleges that DCS "refused" to have the children
forensically interviewed despite the family court finding of manipulation

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

and alienation. Instead, according to Stephens, DCS filed the dependency petition "because [Stephens] felt the children were not being truthful and were being coached by Father into making the allegations. All of which turned out to be true." Finally, Stephens alleges that DCS "refused to consider the allegations were the result of [Kovacs]'s coercion because they did not want to pursue such claims against [Kovacs] and felt he was safer for the [c]hildren to live with than [Stephens] and [her boyfriend]. They were biased."

¶68 No well-pleaded facts permit an inference that DCS lacked an honest belief it could establish the children dependent as to Stephens. The closest Stephens gets are the conclusory statements regarding DCS's alleged awareness of the manipulation and alienation findings, a preference for the children to be with Kovacs, and that DCS was biased. And the allegation that DCS preferred Kovacs is belied by the fact that DCS sought to have the children declared dependent as to him, as well. But there is still the requirement for DCS's belief to be objectively reasonable.

¶69 *Smith v. Lucia*, 173 Ariz. 290 (App. 1992), provides helpful guidance in considering whether a belief is objectively reasonable under the circumstances before us. A belief is not objectively reasonable when "there was no reasonable inquiry into the basis for a pleading or motion." *Id.* at 297. And, taking the Comments to § 662 in mind, we must consider whether it was reasonable for DCS to believe it had sufficient facts to maintain the dependency action "without further investigation or verification," given what DCS knew about the children's veracity and reliability. Accordingly, what did DCS know, and when?

¶70 As alleged by Stephens, and which we must take as true, DCS knew that the family court judge personally interviewed the children in July of 2019, concerning allegations that the children were fearful of and had been abused by Stephens's boyfriend. Following the interviews, the judge found the children's statements were not credible and made no changes to parenting time. It is a reasonable inference that, given the acknowledgment of the family court orders in Oglesby's declaration provided with the ex parte application on April 9, 2020, DCS knew the family court judge determined in July of 2019 that the children's allegations before that court were not credible. And Oglesby also noted in her declaration that "the children appear coached to lie to the Department in regards to their whereabouts."

25

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

¶71	DCS also knew that the judge in an ongoing family court matter between Stephens and Kovacs ruled on February 14, 2020, that:

> [Kovacs] has worked to alienate the children away from [Stephens] and that [Kovacs]'s actions create a risk to the children's mental and emotional wellbeing. [Kovacs]'s efforts have been largely successful to this point—the children do not respect their mother and they refuse to participate in parenting time with their mother. The Court must take action to begin to counteract the effects of [Kovacs]'s inappropriate actions.

Additionally, DCS knew that the family court granted Stephens physical custody of the children based on its February 14, 2020, finding, and that Kovacs was hiding the children from her and was avoiding service. It is likewise a reasonable inference that DCS knew about the same court's February 14, 2020, finding that Kovacs was manipulating the children and alienating them from Stephens.

¶72	Stephens's complaint further provides that on April 17, 2020, DCS filed a report with the juvenile court, stating that during virtual visits, "the children appeared coached to lie to the Department." Finally, at the dependency hearing on July 9, 2020, Oglesby admitted it had crossed her mind that Kovacs was coaching the girls to make the allegations against Stephens.

¶73	From Stephens's allegations, a reasonable inquiry would have included a forensic interview of the children to determine the credibility of the allegations. Although DCS did not have custody of the children until May 6, 2020, between then and the dependency hearing, it could have forensically interviewed the children. And what can we reasonably infer the interviews would have revealed? The March 10, 2021 court report DCS submitted—prepared by a new caseworker and approved by a new supervisor—tells us. The report included a disclosure from the children that Kovacs coached them "to tell egregious lies about" Stephens and her boyfriend, which then led to the juvenile court vacating the dependency finding.

26

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

¶74        The allegations of fear and abuse provided the prism through which DCS and all courts concerned, including the Majority, viewed Stephens.   The allegations served as the basis for concluding that Stephens would not protect the children and that they were and would be in danger if they were in her custody.   The Majority's conclusion that "[t]he complaint does not plausibly allege facts showing that additional interviews, if conducted, would have undermined DCS's reasonable basis to believe it could establish dependency on the children's repeated prior reports," *supra* ¶ 43, perpetuates the reliance on allegations that proved untrue.   Drawing all reasonable inferences in Stephens's favor at the pleading stage, the inference that forensic interviews would have verified Stephens's consistent denials is both reasonable and supported by the record.

¶75        The facts as alleged by Stephens, which we take as true, and the reasonable inferences we are to draw, establish that forensic interviews, as part of an adequate investigation, would have verified what Stephens asserted throughout the proceedings: the allegations were false.   Given what DCS knew regarding the children's reliability and veracity, DCS did not have sufficient information "without further investigation or verification" to maintain the dependency action.

¶76        Stephens has thus sufficiently alleged that DCS lacked probable cause to maintain the dependency action at the motion to dismiss stage for her WICP claim.   *See McAtee v. Morrison and Frampton, PLLP*, 512 P.3d 235, 240 ¶ 24 (Mont. 2021) (reversing summary judgment against plaintiff in malicious prosecution action based on the theory that the defendant in the underlying civil fraud litigation conducted an insufficient investigation to "establish probable cause, because certain witnesses or possible witnesses were not interviewed prior to [the] filing [of] the civil fraud claim"); *Montgomery Ward v. Wilson*, 664 A.2d 916, 923 (Md. Ct. App. 1995) (noting that "questions about the reasonableness of the subsequent investigation [involving unauthorized credit card charges] might still justify a finding of lack of probable cause").

STEPHENS v. STATE
JUSTICE MONTGOMERY, Concurring in Part, Dissenting in Part, and
Dissenting from the Disposition, with which JUSTICE BOLICK joins in Part

## CONCLUSION

¶77      The Majority worries that litigants with valid claims might be deterred from filing suit by the prospect of a WICP claim.  *Supra* ¶ 25. That concern is hardly at issue here.   The point is made in *Griswold v. Horne*, 19 Ariz. 56, 60 (1917):

> It is essential that these tribunals shall be open to all persons who in good faith believe they have grievances against their neighbors, or who in good faith believe the criminal law has been violated. To adopt a policy which would make every unsuccessful plaintiff in a civil case, or every witness for the state in a criminal case, liable in damages to the defendant therein, whenever the plaintiff in the case failed to obtain judgment, would make litigation, so hazardous that men would fear to resort to it.

This case involves neither a private grievance nor a witness in a criminal case.   DCS is unlikely to abandon its statutory duty to protect children for fear of a WICP claim.

¶78      I would affirm the court of appeals, reverse the trial court's dismissal of Stephens's claim to the extent discussed above, and remand for further proceedings.   Whether Stephens's claim survives summary judgment after full discovery and a review of the transcripts of proceedings and other material not available for review at this stage is a separate question.

BOLICK, J., dissenting.

¶79            In this review of the trial court's dismissal of Stephens's wrongful initiation of civil proceedings ("WICP") lawsuit, we are charged with deciding, based on the plaintiff's allegations that we are supposed to presume are true and with all inferences drawn in her favor, *supra* ¶ 24, whether the claim was amply stated. Because the majority attaches talismanic significance to a probable cause finding whose factual basis the judge later recanted and that was largely predicated on DCS's alleged material factual omissions, and because the majority impermissibly makes factual determinations to reach its outcome, I would affirm the unanimous court of appeals decision reversing the dismissal.

¶80            Put differently, we are not supposed to decide here whether DCS was justified in its decision to initiate and maintain dependency proceedings against Stephens, but rather whether Stephens has sufficiently alleged wrongdoing to allow her day in court to prove her case. Given her very troubling allegations, at least some of which are clearly substantiated by the record, denying her a chance to prove her claim is equally troubling.

¶81            DCS has a very important and difficult job, which requires it to make judgment calls in often confusing and rapidly changing circumstances. But the countervailing interests are also great. The Arizona Constitution provides that governments "are established to protect and maintain individual rights." Ariz. Const. art. 2, § 2. Among these is the fundamental right of parents to direct and control the upbringing of their children. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925); *In re M.N.*, 259 Ariz. 120, 142 ¶ 29 (2025). Thus, under Arizona law, no governmental entity may "infringe on these rights without demonstrating that the compelling governmental interest as applied to the child involved is of the highest order, is narrowly tailored and is not otherwise served by a less restrictive means." A.R.S. § 1-601(B); *see also In re M.N.*, 259 Ariz. at 142 ¶ 29.

¶82            This is the balance the law seeks to achieve. Applied against government officials, the wrongful initiation of civil proceedings tort holds such officials accountable for certain malicious actions. But because of the important government interests at stake, the showing a plaintiff must make in a WICP case is exceedingly high: the plaintiff must prove the defendant instituted a civil action motivated by malice, which was begun without probable cause, terminated in plaintiff's favor, and damaged plaintiff. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 416–17 (1988); *see*

*also* Restatement (Second) of Torts § 674 (Am. L. Inst. 1977) (noting that WICP also encompasses wrongfully maintaining a civil proceeding). However, our rules provide that the threshold for surviving a motion to dismiss is quite low. Ariz. R. Civ. P. 12(b)(6); *Coleman v. City of Mesa*, 230 Ariz. 352, 356 ¶¶ 8–9 (2012). In other words, even though WICP claims are difficult to prove, they should not be lightly dismissed, especially given the weighty constitutional and statutory rights at stake. Unfortunately, the Court here upends that balance by eviscerating an important safeguard for individual rights and government accountability.

¶83 Oddly, and without explanation, the majority decides this case not under WICP standards and caselaw, but under the malicious prosecution tort, even though the parties did not argue that theory until we recently requested supplemental briefing. *Supra* ¶ 29. The parties acknowledge that the standards applicable to the two torts are largely overlapping. But as my colleague Justice Montgomery meticulously explains, there are important distinctions between the two, *supra* ¶¶ 51–64, which is unsurprising given that one tort applies in the civil context while the other applies to criminal actions. His examination of relevant Restatement sections and comments also underscores the danger of "adopting" Restatement provisions, rather than merely looking to them for whatever persuasive authority they may supply. I join Justice Montgomery's analysis rather than repeating it; and, unlike the majority, I would apply the standards for the tort that was alleged and argued rather than the one that was not.

¶84 Regardless, the outcome should be the same under either body of law. The leading malicious prosecution case, *Wisniski v. Ong*, holds that a judicial finding conclusively establishes probable cause, unless (among other things not pertinent here) it is induced by acts of the defendant "of [a] similar nature to extrinsic fraud and perjury, acts which would tend to vitiate a judgment on collateral attack." 94 Ariz. 123, 125 (1963). Applying either standard, Stephens is entitled to her day in court.

¶85 Stephens's amended complaint clearly states a WICP claim. The latter elements of the claim are essentially undisputed. The proceedings ultimately were terminated in plaintiff's favor and the proceedings unquestionably damaged her. Every day a parent is wrongfully deprived of her child, or in which a cloud of unnecessary uncertainty hovers over the parent/child relationship, inflicts injury upon the parent and the child as well. *Cf. Stanley v. Illinois*, 405 U.S. 645, 651

(1972) ("The integrity of the family unit has found protection in the Due Process Clause."); *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion) ("[T]he Constitution protects the sanctity of the family precisely because the institution of the family is deeply rooted in this Nation's history and tradition.").

¶86　　　　In terms of malice and lack of probable cause, Stephens alleged the family court proceedings that led to the children's initial placement with their father quickly took a different direction, and this should have placed DCS on actual or inquiry notice that no basis existed for further action against her.　Judge Blaney seemed to have figured out the situation earlier than anyone else, finding in February 2020 that Father "has worked to alienate the children away from Mother," creating a "risk to the children's mental and emotional wellbeing," and ruling that the "Court must take action to begin to counteract the effects of Father's inappropriate actions."　The following month, the court awarded physical custody of the minor children to Stephens, notwithstanding that Father had absconded with the children.

¶87　　　　Despite this ruling and the court's basis for it, only nine days later, DCS submitted a declaration in a family court, seeking removal of custody from Stephens.　According to the amended complaint here, which again we are supposed to accept as true for the limited purpose of reviewing the viability of her complaint, DCS made misrepresentations and omissions "material to the finding of probable cause."　For instance, DCS asserted that Father had obtained a protective order against Stephens for brandishing a weapon but did not report that the order was dismissed following an evidentiary hearing.　DCS did not disclose that Father was alienating the children against Stephens.　DCS did not report that during the preceding year, the family court interviewed the children and found their claims against mother to be not credible.

¶88　　　　Based on an incomplete and misleading DCS declaration, the court authorized removal on April 9, 2020.　Five days later, DCS filed a juvenile court dependency action, supported by a DCS declaration that again failed to mention alienation, manipulation, coaching, and/or coercion by Father.　But only three days later, DCS filed with the court a report saying that "during the visits, the children appeared coached to lie to the Department."　Still, DCS persisted with the dependency proceeding and failed to conduct a forensic interview with the children to independently determine the veracity of their prior claims against Stephens

31

and her boyfriend. At the dependency hearing, the DCS caseworker testified that it had crossed her mind that Father coached the children to make allegations against Stephens.

**¶89** I pause here to consider that specific chain of events. DCS was relying heavily on the children's prior statements that were thrown into doubt by Judge Blaney, by its own report indicating the children may have been coached to lie, and by the caseworker who expressed concern about the children's veracity—yet DCS never conducted a forensic examination to determine the truth. Imagine if a criminal prosecutor failed to verify such crucial testimony when it was cast into doubt. Again, Justice Montgomery probes DCS's failure here in the context of the sufficiency of the pleading and concludes, as I do, that it supports a WICP claim against dismissal. *Supra* ¶¶ 65–76.

**¶90** On July 9, 2020, based on DCS's assertions, the court found dependency existed for both children as to Stephens. The court of appeals affirmed, applying an abuse of discretion standard, and citing extensively the children's assertions about Stephens and her boyfriend. *Stephanie S. v. Dep't of Child Safety*, No. 1 CA-JV 20-0153, 2021 WL 1578158, at *1 ¶ 1, *2 ¶ 9 (Ariz. App. Apr. 22, 2021) (mem. decision).

**¶91** In March 2021, a new DCS caseworker filed a court report casting doubt on evidence submitted at the dependency hearing. The children disclosed they had been coached by Father to lie about Stephens and her boyfriend.

**¶92** The children were returned to their mother in spring 2021 and the dependencies were dismissed. Judge Whitten subsequently vacated the prior dependency orders, stating that they were based almost exclusively on the children's false allegations, coached by Father, regarding Stephens and her boyfriend. Although DCS argued that "there were other, much less serious allegations raised in the initial reports," Judge Whitten stated the court "certainly would not have" found a dependency on the record that existed on July 9, 2020, had the court known that Father coached the children to make false allegations of abuse.

**¶93** Again, I pause to note that, although the majority gives Judge Whitten's ruling only cursory attention, it is truly extraordinary for a court to recant its earlier ruling in such strong terms and to so clearly identify the basis for the prior erroneous ruling: misleading and incomplete

testimony presented by DCS. In other words, DCS's assertions and omissions would not only "tend to vitiate [the] judgment," *Wisniski*, 94 Ariz. at 125, they *did* vitiate the judgment. Indeed, that evidence was not only the basis for the dependency order, but for the subsequent court of appeals' affirmance of that order. *Stephanie S.*, 2021 WL 1578158, at *3 ¶ 16. And the court of appeals here drew precisely that distinction when it unanimously reversed the dismissal of the WICP action, observing that Mother alleged that DCS "acted with conscious disregard for relevant judicial determinations and that they concealed the same." *Stephens v. State*, No. 1 CA-CV 24-0309, 2025 WL 657568 at *3 ¶ 9 (Ariz. App. Feb. 27, 2025) (mem. decision). None of the WICP or malicious prosecution decisions cited by the majority involved a trial court's recantation of a prior order, based on evidence that the presenting party had strong reason to know or believe was faulty. That scenario is as compelling as it is rare.

¶94 Stephens alleges that DCS was "well aware of Father[']s manipulation, coercion, alienation of the Children and failed to include this information in the Dependency Petition and failed to take any action to determine the truthfulness of the allegations before or after taking the children into custody," and that the "dependency proceedings were motivated by malice."

¶95 If taken as true, which is how we are supposed to take them for purposes of a motion to dismiss, these allegations would make out a textbook case of WICP. *See Bradshaw*, 157 Ariz. at 416–17. But the majority concludes that the probable cause finding that occurred along the way, even if based on false premises, was sufficient to extinguish Stephens's opportunity to seek recourse through a WICP claim. *Supra* ¶ 33–35.

¶96 The majority states that the existence of probable cause is a question of law, involving objective and subjective inquiries. *Supra* ¶ 38. It says that "[a]lthough DCS could not base its belief on facts it knew were untrue, it was not required to be absolutely certain of the factual basis for the dependency, only that it reasonably believed it had a good chance of establishing the dependency to the court's satisfaction." *Id.*

¶97 Note that verbiage: DCS need not have a good faith belief that removal is warranted based on all the information available to it; it merely needs to reasonably believe it had a good chance of establishing the dependency to the court's satisfaction, apparently even if its case was based on incomplete or erroneous key information.

¶98 Regardless, the majority leaps too swiftly to its conclusion, for as this Court cautioned in *Bradshaw*, "[i]f the operative facts are undisputed, the existence of probable cause is a question of law to be determined solely by the court[s]"—but if they are contested, it is a question for the jury. 157 Ariz. at 419; *accord Carroll v. Kalar*, 112 Ariz. 595, 598–99 (1976). There could hardly be a case where probable cause was more sharply contested. But rather than fully crediting Stephens's assertions and permitting discovery and testimony that would resolve the matter, the majority concludes from its own examination of the record that Stephens failed to "plausibly" allege DCS malfeasance, that DCS believed that dependency was warranted, and that, as a matter of law, the belief was reasonable. *Supra* ¶¶ 33–35, 41. As we are supposed to accept Stephens's assertions as true and view them in the light most favorable to allowing the action to proceed, *supra* ¶ 24, I conclude the majority errs in denying Stephens her day in court. Indeed, to the contrary, I would conclude that the juvenile court's recantation of its prior order, and the basis for doing so, is more than sufficient to establish a prima facie WICP case.

¶99 And as Justice Montgomery points out, even if DCS had a sufficiently reasonable belief to *initiate* the dependency proceeding, it certainly did not have such grounds to *maintain* it. *Supra* ¶ 75. To manifest doubt about crucial evidence yet proceed full-steam without fully confirming the evidentiary premises would seem to be precisely the sort of government behavior for which a WICP or malicious prosecution claim may properly be directed.

¶100 The rule of law the majority applies is highly problematic. A probable cause finding, even if predicated upon false and coached assertions by the children and material omissions by DCS, becomes a get-out-of-consequences card for DCS, not only at the outset but insulating DCS from maintaining an action it knows does not have a basis. Luckily here, a subsequent DCS caseworker came forward and presented evidence that Stephens alleges DCS already knew; but had that not happened, by this Court's ruling, DCS could have continued to maintain the dependency. In the criminal context, if a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included . . . in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," the defendant is entitled to an evidentiary hearing. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Here, by contrast, the Court finds that, despite such allegations, the claim may be dismissed.

¶**101**    The amended complaint presents a truly extraordinary juxtaposition: factual findings and orders made by the family court that directly undercut the subsequent finding of probable cause, a finding of probable cause made on a record containing material omissions, and a subsequent judicial recantation of the basis for that finding on account of the omissions.    If a WICP lawsuit cannot move forward under those circumstances, the ability to hold the government accountable for wrongdoing is illusory.    And given the awesome power at DCS's disposal, it is very important to establish that manifest abuse of that power will have consequences.

¶**102**    The majority knits the façade of a just result but not the reality. I believe Stephens's claim against DCS, no matter how uphill the climb it faces, should be allowed to proceed; and, therefore, with great respect to my colleagues, I dissent.